## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DESARAY WILLIAMS, | ) | CASE NO. 5:15CV02185 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Desaray Williams ("Plaintiff" or "Williams"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423,

1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is

before the undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for preparation of a Report and Recommendation.  For the reasons set forth

below, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

## I. PROCEDURAL HISTORY

In July 2012, Williams filed applications for DIB and SSI, alleging a disability onset date

of February 1, 2011 and claiming she was disabled due to "injury back sarcodiosis."  (Transcript

("Tr.") 173-78.)  The applications were denied initially and upon reconsideration, and Williams requested a hearing before an administrative law judge ("ALJ"). (Tr. 97-99, 100-02, 107-08, 112-13.)

On May 22, 2014, the ALJ held a hearing, and Williams amended her onset date to January 26, 2012.  (Tr. 28).  Williams, represented by counsel, and an impartial vocational expert ("VE") both testified.  (Tr. 25-56.)  On June 26, 2014, the ALJ issued a written decision finding Williams was not disabled.  (Tr. 10-19.)  The ALJ's decision became final on August 26, 2015, when the Appeals Council declined further review.  (Tr. 1-6.)

On October 22, 2015, Williams filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16, 17.) Williams asserts the following assignments of error:

(1)  That the ALJ's evaluation of Plaintiff's treating source was deficient such that the ALJ's disability determination was not supported by substantial evidence.

(2)  That ALJ's failure to properly evaluate Plaintiff's physical therapist's residual functional capacity assessment violated Social Security Ruling 06-3p.

(3) That a Sentence Six remand is appropriate.

(Doc. No. 14 at 2.)

## II. EVIDENCE

### A.        Personal and Vocational Evidence

Williams was born on September 7, 1968 and was 43 years-old at the time of her administrative hearing, making her a "younger" person aged 18-49 under social security regulations.  (Tr. 17).  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a high school education

2

and is able to communicate in English.  (Tr. 17).  She has past relevant work as a nurse assistant. (Tr. 17).

### B.  Medical Evidence - Physical Impairments

The record shows that beginning in June 2011, Plaintiff was seen by Dai Kohara, M.D., for complaints of back pain.  She described the pain as "an ache, deep, discomforting, numbness and sharp."  (Tr. 290).  Plaintiff's symptoms at that time were reportedly relieved by pain medication.  (Tr. 290, 294).

Then, in August 2011, she injured her back at work.  Over the year that followed, Plaintiff was seen ten (10) times by Dr. Kohara, M.D.[1]  Plaintiff complained of aches and spasms in the lower back and right flank.  (Tr. 463-65).  The severity was described as mild to mild-moderate.  (Tr. 463-65).  Physical examination consistently revealed muscle spasm, posterior tenderness in the spine, tenderness to the lumbar spine, and mildly reduced range of motion.  (Tr. 461).  For a time, pain was relieved by medication.  (Tr. 282, 286).  At other times, there were no relieving factors.  (Tr. 254, 258, 262, 266, 270, 274, 278).   According to Dr. Kohara's notes dated February 3, 2012, an MRI showed "OA, disc bulge."  Dr. Kohara indicated she would "give inj[ection], [but] if not better[,] [will] send to spinal [surgery]."  (Tr. 457).  By August 9, 2012, Plaintiff was complaining that the pain "has radiated to the left calf, right calf, left thigh and right thigh."  (Tr. 427).

---

[1]    From September 2011 to August 2012, Plaintiff presented to Dr. Kohara on April 9, 2012 (Tr. 447-450), April 27, 2012 (Tr. 443-446), June 14, 2012 (Tr. 439-442), June 28, 2012 (Tr. 435-438), July 23, 2012 (Tr. 431-434), and August 9, 2012 (Tr. 427-430).

Plaintiff was referred to Jeffrey Tharp, D.O., a back surgeon.  On June 25, 2012, Plaintiff presented to Dr. Tharp and complained of a history of back pain which was exacerbated by her injury in September 2011.  (Tr. 303).  She rated her pain at 8 out of 10 and complained that she occasionally experiences numbness down her legs when she stands or walks.  (Tr. 303).  Pain was reportedly worse with sitting or bending.  (Tr. 303).  Her treatments (injections, physical therapy, and medications) did not provide relief.  (Tr. 303).

On examination, Plaintiff had no pain to palpation in the shoulders, cervical, thoracic, and lumbar spine or sciatic notch.  (Tr. 304).  Dr. Tharp tested her range of motion and noted "forward flexes at the waist 60 degrees and walks up on her thighs and extends to 30 degrees with pain.  In seated position forward flexes the neck 50 degrees, extends 50 degrees and rotates 50 degrees without pain and crepitus."  (Tr. 304).  Diagnostic imaging dated June 25, 2012 was abnormal.  (Tr. 304).  Dr. Tharp's assessment included

> degeneration of lumbar or lumbrosacral intervertebral disc, displacement of lumbar intervertebral disk without myelopathy, spinal stenosis of lumbar region, thoracic or lumbrosacral neuritis or radiculitis, unspecified, and lumbrosacral spondylosis without myelopathy.

(Tr. 303).

On August 27, 2012, Plaintiff had a preoperative appointment with Dr. Tharp, and he offered surgical intervention of a laminectomy and fusion at the L5-S1 level.  (Tr. 475).  Dr. Tharp performed Plaintiff's surgery on August 28, 2016.  (Tr. 516).

4

In the months following her surgery, Plaintiff was seen by Dr. Kohara numerous times,[2] complaining of aching, shooting, stabbing pain in the lower back, radiating to both calves and both thighs.  (Tr. 366, 361, 356, 410, 405, 401, 484).  Pain was aggravated by daily activities with no relieving factors.  (Tr. 366, 361, 356, 410, 405, 401, 484).  Physical exam revealed tenderness to the lumbar spine (Tr. 368, 363, 359, 403, 487, 504, 508), muscle spasm (Tr. 408, 504) and moderate pain with motion (Tr. 368, 363, 359, 408, 403, 487, 504, 508); Muscle spasm and mildly reduced range of motion the thoracic spine, (Tr. 412); Muscle spasm and moderate pain with motion in the cervical spine (Tr. 492); and tenderness and mildly reduced range of motion in both knees.  (Tr. 359).  Dr. Kohara assessed sciatica due to displacement of lumbar disc.  (Tr. 368, 403, 487, 504).  Plaintiff continued with her pain meds. (Tr. 361, 404, 504).

Plaintiff was also seen a number of times after the surgery by Dr. Tharp.  On September 26, 2012, pain was rated at 6 out of 10, and Dr. Tharp indicated that Plaintiff was 70% improved. (Tr. 472).   She had no pain to palpation in shoulders, cervical, thoracic and lumbar spine or sciatic notch.  (Tr. 472).  He tested her range of motion and noted "forward flexes at the waist 70 degrees and extends to 30 degrees with minimal pain.  In seated position forward flexes the neck 50 degrees, extends 50 degrees and rotates 50 degrees without pain or crepitus."  (Tr. 472). Motor strength was 5 out of 5 in upper and lower extremities in all myotomes.

---

[2]     According to the administrative record, Plaintiff was seen by Dr. Kohara eleven 11 times following her surgery:  September, 12, 2012 (Tr. 366); October 3, 2012 (Tr. 361); October 25, 2012 (Tr. 356); December 5, 2012 (Tr. 410); January 8, 2013 (Tr. 405); January 23, 2013 (Tr. 401); March 6, 2013 (Tr. 366); April 4, 2013 (Tr.484), April 8, 2013 (Tr. 489); May 6, 2013 (Tr. 497); June 6, 2013 (Tr.501); July 31, 2013 (Tr. 506).

On January 9, 2013, Dr. Tharp observed a normal gait, and good strength in heel to toe ambulation with good coordination.  (Tr. 383).  There was no pain to palpation in the shoulders, cervical, thoracic and lumbar spine or sciatic notch.  (Tr. 383).  He tested her range of motion and noted "forward flexes at the waist 90 degrees and extends to 30 degrees with minimal pain. In seated position forward flexes the neck 50 degrees, extends 50 degrees and rotates 50 degrees without pain or crepitus.  Motor strength was 5/5 in all myotomes.  (Tr. 383).

On February 13, 2013, Plaintiff presented to Dr. Tharp with a pain rating of five out of ten.  (Tr. 380).  Dr. Tharp noted that she was five and a half months post-op and sixty percent improved.  (Tr. 380).  Results of a physical examination were unchanged from her previous visit except that her forward flexes at the waist were 70 degrees.  (Tr. 380).  Two months later, Plaintiff was in a car accident.  (Tr. 495). Plaintiff was diagnosed with whiplash (Tr. 512).  In August 2013, her treatment notes showed lower back pain flare up.  (Tr. 519, 518).  In December 2013, Plaintiff presented to Dr. Tharp complaining of low back pain and occasional right leg pain, with symptoms occurring with certain twisting motions.  (Tr. 515).  She claimed to be 60 to 70 percent improved and pain was rated at four out of ten.  (Tr. 515).

In December 2013, Plaintiff was in another car accident, but only sustained a bruised tendon.  (Tr. 537).  During a physical examination that same month, Plaintiff had normal range of motion in her neck and no spinal tenderness or reduced range of motion.  (Tr. 528).  During a visit with Dr. Tharp that same month, Plaintiff had no pain to palpation in her shoulders, spine, or neck; had full strength in her arms and legs; and slight decrease in her range of motion in her back and legs (Tr. 516).

6

### C. Opinion Evidence

#### 1. Dr. Kohara

In April 2013, Dai Kohara, M.D., completed a medical opinion regarding Plaintiff's ability to do work-related activities.  (Tr. 482).  Dr. Kohara opined that Plaintiff could frequently lift/carry less than 10 pounds; stand and walk less than 2 hours per day; could sit for up to 2 hours per day and would have to change positions every 15 minutes; could stand for 20 minutes before needing to change positions; must walk for 10 minutes every 30 minutes; and would need to lie down during unpredictable intervals during an 8-hour work shift every 2 hours.  (Tr. 482). Dr. Kohara supported his opinion by noting that Plaintiff had lumbar disc displacement and severe lumbar pain.  (Tr. 482).  Dr. Kohara opined that Plaintiff could never twist, stoop, bend, crouch, or climb ladders, and could occasionally climb stairs.  (Tr. 483).  Dr. Kohara also opined that Plaintiff would be limited in her ability to reach overhead, push, and pull and would need to avoid exposure to extreme cold, heat, and humidity.  (Tr. 483).  Finally, Dr. Kohara opined that Plaintiff would be absent from work more than 4 days per month.  (Tr. 483).

#### 2. Diane Manos, M.D.

Diane Manos, M.D., reviewed Plaintiff's records on behalf of the state agency on December 4, 2012.  (Tr. 65).  Dr. Manos opined that Plaintiff would be capable of light-range work and could lift/carry 20 pounds occasionally and 10 pounds frequently; stand or walk for 6 hours in an 8-hour day; sit for 6 hours of an 8-hour day; had no limitations with pushing or pulling; could occasionally crawl and climb ladders, ropes, and scaffolds; and could frequently stoop and climb stairs and ramps.  (Tr. 62-63).

7

### 3. James L. Johnson, D.O.

On December 12, 2012, James L. Johnston, D.O., performed a partial disability examination on Plaintiff in connection with her Worker's Compensation claim.  (Tr. 547).  Dr. Johnston observed Plaintiff with a normal gait, limited range of motion in her spine, and some decreased leg strength.  (Tr. 548).  He opined, in accordance with American Medical Association Guidelines, that Plaintiff was 8% disabled.  (Tr. 548).

### 4. Gregory J Gordon, D.C

On January 3, 2013, Gregory J. Gordon, D.C., examined Plaintiff in connection with her Worker's Compensation claim.  (Tr. 549).  Dr. Gordon found that Plaintiff had some tenderness and guarding upon palpitation on her spine.  (Tr. 549).  She was able to toe-heel walk, but complained of lower back pain.  (Tr. 549).  Dr. Gordon opined that Plaintiff was 11% impaired. (Tr. 550).

### 5. Jeffrey Vasiloff, M.D.

In January 2013, Jeffrey Vasiloff, M.D., reviewed Plaintiff's records on reconsideration on behalf of the state agency.  (Tr. 85).  Dr. Vasiloff opined that Plaintiff could perform light-range work with frequent balancing; occasional climbing of ramps/stairs, stooping, kneeling, crouching, and crawling; and no climbing of ladders, ropes, or scaffolds.  (Tr. 82-83).

### 6. Jack Eckroad, Physical Therapist

On May 14, 2014, physical therapist Jack Eckroad completed a Functional Capacity Evaluation on Plaintiff.  (Tr. 627).  Eckroad reported that during the physical examination, Plaintiff gave "sub-maximal" effort, and that she was capable of doing more physically than she demonstrated during the testing.  (Tr. 627).  Mr. Eckroad also noted that "overall test findings, in

8

combination with clinical observations, suggest considerable question be drawn as to the reliability/accuracy of [Plaintiff's] subjective reports of pain/limitation." (Tr. 627).

Despite these caveats, Mr. Eckroad opined that Plaintiff was capable of a less-than-sedentary position and would be unable to return to her past job. (Tr. 628). He also opined that she would also benefit from a brief back rehabilitation program to educate her on better management of her back condition. (Tr. 628). Mr. Eckroad opined that, based on the examination, Plaintiff was not capable of employment, and there was "no reasonable medical certainty" that she would ever be capable of competitive employment or ever be able to perform at a higher physical demand level than demonstrated during the testing. (Tr. 628).

**D.     Hearing Testimony**

During the May 22, 2014 hearing, Williams testified to the following:

- that she lives with her mother and her four-year old son

- She injured her back in 2011 when lifting a patient at work. (Tr. 310). She experienced pain, numbness, tingling, and weakness. (Tr. 310). After receiving an MRI, she was told she had a lower back sprain. (Tr. 32). She was given pain medications and injections. (Tr. 32). Plaintiff filed a Worker's Compensation claim but her claim was denied because she had a pre-existing condition. (Tr. 45-46).

- In 2012, Williams had back surgery, which helped with the pain, but she continued to experience numbness and tingling down her legs and back. (Tr. 33).

- During the period between hurting her back and having surgery, she was able to do "pretty much nothing" around the house, and she was unable to drive. 9Tr. 33). Her daughters helped her bathe and get dressed and prepare meals. (Tr. 33).

- After surgery, she was able to bathe herself. (Tr. 35). With some assistance, she was able to dress herself. (Tr. 35). Her daughters continued to do the cooking and grocery shopping, but sometimes Williams would go with them. (Tr. 35). When she did go to the grocery store, she used a motorized scooter.

9

(Tr. 35).  The children continued to do household chores.  (Tr. 35).  She rated her pain at an eight (8) on a scale of ten (10) following the surgery.  (Tr. 36). Before her surgery, she rated her pain at a ten out of ten.  (Tr. 36).  When she sat for longer than twenty five (25) minutes, she experienced numbness and tingling, and she would need to stand up and move around for five or six minutes. (Tr. 36).  She said she could stand for about a half hour without experiencing any numbness or tingling.  (Tr. 37).  She testified that she could not walk more than 50 feet.  (Tr. 38).

• In April 2013, Plaintiff was injured in a car accident, which resulted in neck and shoulder pain.  (Tr. 38-39).  Later that year, she was in a second car accident, injuring her neck and her other shoulder.  (Tr. 39).  Her pain was constant, but with her medication it went away.  If she tried to lift something, the pain would come back.  (Tr. 39-40).

• In October 2013,  she was diagnosed with carpal tunnel syndrome in both hands, but it was worse in her left hand.  (Tr. 40).  Plaintiff wore a brace on her left hand during the day.  (Tr. 40-41).  Because of the carpal tunnel, she had difficulty grabbing and picking up things.  (Tr. 41).  She complained of numbness, soreness, and swelling.  (Tr. 41).  She complained that she was unable to tie her shoes, button her clothes, or carry a gallon of milk.  (Tr. 41).

• She testified that she was unable to lift more than five pounds with her right hand, and she testified that she was unable to lift anything with her left.  (Tr. 42).

• The combination of her blood pressure medication and pain medication (Vicodin) makes her sleepy, and she takes two thirty-five minute naps during the day.  (Tr. 42-43).

The ALJ asked Counsel about the records relating to Plaintiff's physical therapy with Mr. Eckroad and the MRI she had in 2011.  (Tr. 43, 47).  Plaintiff's counsel said that neither was in the record.  (Tr. 43. 47).  The ALJ asked Plaintiff's counsel to complete the record and include the physical therapy recrods, the MRI, and any follow up diagnostic tests.  (Tr. 50).

The VE testified that Williams had past work as a nurse associate.  (Tr. 51).  The ALJ then posed the following hypothetical question:

If you would assume, first, a hypothetical worker able to lift and carry 20 pounds occasionally, ten pounds frequently, who can stand and/or walk for a total of about six

10

> hours in an eight-hour day with the normal breaks, sit for a total of about six hours in an eight-hour day with the normal breaks.  Not able to climb items such as ladders or scaffolds.  No more than occasionally using ramps or stairs, stooping, kneeling, crouching, or crawling.  Otherwise, able to perform at the light exertional capacity.  If you considered those factors, that appears it would preclude the past work.  Is that correct?

(Tr. 51).

The VE testified that his hypothetical individual would not be able to perform past work as a nurse associate.  (Tr. 51).  The ALJ asked a follow-up question to the first hypothetical:

> And would an individual having that residual functional capacity and the same vocational characteristics as the claimant in terms of age, education, and work experience retain the ability to adjust to an perform other types of work?

(Tr. 52).  The VE testified that such a person would be able to adjust and perform other types of work, such as assembler of small products, inspector and hand packager, and mail clerk.  (Tr. 52).

The ALJ asked a second hypothetical which assumed all the factors from the first hypothetical and also assumed "that grasping, handling, and fingering with the non-dominant hand would be limited to, to frequent, but not continuous. . . ."  (Tr. 52).  The VE testified that the added limitations would have no effect the ability to perform jobs as inspector and mail, but would affect the ability to perform the assembly job.  (Tr. 52).  However, the VE testified that with the added limitation the hypothetical individual would be able to perform work as an assembler of electrical accessories.  (Tr. 52).

The ALJ posed a third hypothetical:

> Worker [is] able to lift, lift and carry less than ten pounds, stand and /or walk less than two hours in a workday, sit less -- sit about two hours in a workday and essentially need the opportunity to change positions as desired.  Would that allow the past work?

11

(Tr. 52-53).  The VE testified that there would be no work for an individual with such limitations.  (Tr. 53).

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the

12

impairment, or combination of impairments, meets or medically equals a required listing under

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of

age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the

claimant's impairment or combination of impairments does not prevent him from doing his past

relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his

past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Willliams was insured on her alleged disability onset date, January 26, 2012, and

remained insured through June 30, 2017, her DLI.  (Tr. 13.)  Therefore, in order to be entitled to

DIB, Williams must establish a continuous twelve month period of disability commencing

between these dates.  Any discontinuity in the twelve month period precludes an entitlement to

benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d

191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2017.

2.    The claimant has not engaged in substantial gainful activity since January 26, 2012, the amended alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairments: degenerative disk disease and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant cannot climb ladders/ropes/scaffolds and can occasionally climb ramps/stairs, stoop, kneel, crouch or crawl.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)

7.   The claimant was born on September 7, 1968 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communcate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from January 26, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 10-18).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to

14

proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

      Review of the Commissioner's decision must be based on the record as a whole.  *Heston*

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial

evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.

2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of*

*Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support

another conclusion, the decision of the Administrative Law Judge must stand if the evidence

could reasonably support the conclusion reached.").  This is so because there is a "zone of

choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*,

800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

      In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.        First Assignment of Error: Treating Physician Rule

In her first assignment of error, Williams argues that reversal is warranted because the ALJ's evaluation of her treating physician Dr. Kohara was legally and procedurally deficient.  A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a finding

that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[3]

        If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some

---

[3] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

17

reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[4]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that

_____

[4] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

18

you are 'disabled' or 'unable to work' does not mean that we will determine that you are

disabled." *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of

disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d

954, 958 n. 1 (11th Cir. 1982).

> In this case, Plaintiff's treating physician Dr. Kohara opined that Williams

> can lift and carry less than ten (10) pounds on either a frequent or occasional basis; that she can stand and walk for less than two (2) hours during an eight-hour day (with normal breaks); that she can sit during an eight hour day with normal breaks for about two hours; that she can sit for 15 minutes before changing position; that she can stand for 20 minutes before changing position; that every thirty minutes she must walk around for ten minutes; that she needs the opportunity to shift at will; that she may need to lie down at unpredictable intervals during an eight-hour period; that she is unable to twist, stoop (bend), crouch, or climb ladders, and only occasionally climb stairs.  (Tr. 482-83). Dr. Kohara anticipated that Williams would be absent from work due to her impairments or treatment more than four days per month.  (Tr. 483).

> The ALJ gave Dr. Kohara's opinion little weight because

> it is not consistent with the evidence as a whole, which revealed that the claimant's condition has improved since surgery.  Additionally, his findings are not consistent with the aforementioned physical examinations that were conducted by other treating sources.

(Tr. 16).

> The "aforementioned physical examinations" are described as follows:

> In terms of the claimant's alleged lower back pain and leg weakness, the record indicates that the claimant did have a work injury in September 2011 and imaging revealed that she had degenerative disk disease in her lumbar spine.  Treatment notes from June 2012 indicated that she rated her pain as an 8/10 (Ex. 1F, pg. 56).  However, a physical examination did not support her subjective complaints of pain, as it revealed that she had no tenderness to palpitation [sic] in her spine and 5/5 strength in her lower extremities.  In August 2012, the claimant underwent a laminectomy fusion, which certainly suggests that her pain was genuine.  (Ex. 20F, pg. 14).  While that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the pain symptoms. Since the surgery, the claimant has rated her pain as a 4-5/10.  (Ex. 11F p. 2).  She also had no tenderness to palpitation [sic] in her spine as well as good strength, stability and range

of motion in her hips, knees and ankles.  (Ex. 11F, pg. 2 and Ex12F, pg. 5). The only clinical deficit was a decreased range of motion.  (11F, pg. 2).

The ALJ further noted:

The undersigned finds that the claimant does indeed experience pain resulting from her degenerative disc disease.  This issue; however, is not whether the claimant has pain, but rather the degree of her pain and whether it renders her disabled. Notwithstanding the claimant's allegations of pain, she has consistently maintained a normal gait, 5/5 strength and no tenderness to palpitations [sic] in her [sic] (Ex. 1F, p. 57 and Ex. 11F, pg. 2).  Additionally, nerve conduction studies of her lower extremities were normal. (Ex. 17F).  Moreover, since her surgery she has rated her pain as only a 4-5/10.  (Ex. 7F, pg. 5 and Ex. 11F, pg. 1).  While this rating establishes limitations as a result of her degenerative disk disease, it hardly rises to the level of disabling.  At the

(Tr. 15).  Plaintiff maintains that the ALJ did not provide sufficiently specific "good reasons" for discounting Dr. Kohara's opinion; that he improperly "played doctor" by concluding that the objective findings of other treating sources undermined Dr. Kohara's opinion; and that the ALJ applied the wrong legal standard.

Contrary to Plaintiff's assertion, the ALJ gave two good reasons why Dr. Kohara's opinion deserved little weight, and he supported both reasons with citations to the record.  First, the ALJ concluded that based on the record Plaintiff's condition had improved since the time of her August 2012 surgery.  In support of this conclusion, the ALJ cited Plaintiff's own reports of pain to Dr. Kohara and another treating source, Dr. Tharp.  On June 25, 2012, before her surgery, Plaintiff was seen by Dr. Kohara. At that time, Plaintiff described her pain as an eight (8) on a scale of ten (10) but worse with sitting or bending.  (Tr. 303).  A month after her surgery, on September 26, 2012, she was seen by Dr. Tharp, and she rated her pain as a six (6) out of ten (10).  (Tr. 472).  She was seen by Dr. Tharp in February and in December of 2013, and she rated her pain as a five (5) and a four (4), respectively. (Tr. 380, 515).  Also in December 2013, she

20

reported to Dr. Tharp that she was 60 to 70 percent improved.  (*Id.*).  Based on Plaintiff's own reports, the ALJ reasonably concluded that her level of pain had improved.

Further, the ALJ cited other objective record evidence that reasonably contradicts Dr. Kohara's medical opinion.  For instance, a nerve conduction study of her lower extremities completed on February 12, 2012 was normal.  (Tr. 545).  After her surgery, Plaintiff had multiple visits to Dr. Tharp, and she consistently experienced no pain to palpation in her shoulders, her cervical, thoracic and lumbar spine, or the sciatic notch.  (Doc. 472, 383, 381, 516).  Multiple post-surgery exams showed normal gait and good strength in heel-to-toe ambulation with good coordination.  (Tr. 472, 383, 381, 516).  Also in December 2013, a physical exam revealed normal range of motion in the neck, no thoracic spine tenderness, normal thoracic spine range of motion, and no lumbar spine tenderness.  (Tr. 528).  The ALJ also noted that Plaintiff consistently demonstrated 5/5 strength in upper and lower extremities after her surgery (Tr. 472, 383, 381, 516).  Finally, the ALJ indicated that Plaintiff's subjective complaints of pain were questionable as there was evidence that she was independent in her activities of daily living, housekeeping, meals, and transportation.  (Tr. 81).

While Plaintiff acknowledges that the above evidence was cited by the ALJ, Plaintiff maintains that by relying on it, the ALJ improperly substituted his judgment for that of Dr. Kohara.  Although an ALJ is required to consider their "the qualifications of the experts, the opinions' reasoning, their reliance on objectively determinable symptoms and established science, their detail of analysis, and their freedom from irrelevant distractions and prejudices," *Underwood v. Elkay Mining*, 105 F.3d 946, 951 (4th Cir.1997), an ALJ "may not substitute his own medical judgment for that of the treating physician where the opinion of the treating

physician is supported by the medical evidence."  *Meece v. Barnhart*, 192 Fed.Appx. 456, 465 (6th Cir.2006); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996) (stating "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").

In one representative case, the Sixth Circuit established that an ALJ impermissibly "played doctor" by rejecting a treating physician's opinion as "implausible" on the ground that "[i]t is inconceivable that this claimant who has had pain due to pelvic adhesions with otherwise normal examinations would be completely unable to move or do anything at all."  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009).  In another case, an ALJ impermissibly played doctor when he discounted a treating physician's medical opinion because the treating physician prescribed certain pain medications but not others that the ALJ thought would have been more appropriate.  *Meece*, 192 Fed.Appx. at 465.

In the present case, unlike *Meece* and *Simpson*, the ALJ did not render a medical judgment.  Rather, the ALJ observed that objective evidence (in the form of multiple post-surgery treatment notes) supported the conclusions that Plaintiff's physical limitations were not as severe as her treating physician opined and that Plaintiff's pain was not as severe as she claimed.  Under the regulations, the ALJ may consider whether a treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2).  In this case, Dr. Kohara indicated that the physical restrictions she opined to were supported by a medical finding of "severe lumbar pain."  (Tr. 483).  The ALJ was authorized to consider

22

whether Dr. Kohara's opinion was contradicted by objective medical evidence provided by another treating source.  The ALJ did not "play doctor" in this case.

Plaintiff also argues that the ALJ erred by failing to identify Dr. Kohara as her treating physician and sufficiently address the record as a whole.  (Doc. No. 14 at 9).  It is evident that the ALJ viewed Dr. Kohara as a treating physician, as demonstrated by his conclusion that Dr. Kohara's opinion was inconsistent with the "physical examinations . . . conducted by *other* treating sources."  (Tr. 16).  By referencing "other treating sources," and by fulfilling the reason giving requirement described above, it is clear that the ALJ also perceived Dr. Kohara as a treating source.

As for Plaintiff's assertion that the ALJ should have addressed the record as a whole, there is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record.  *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir.1989) ("a written evaluation of every piece of testimony and submitted evidence is not required"); *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir.1987) (ALJ need only articulate his rationale sufficiently to allow meaningful review).  Here, the ALJ provided specific reasons for discounting Dr. Kohara's opinion, and he supported those reasons with evidence from the record.  And while there may be substantial evidence in the record to support Plaintiff's position, the decision of the ALJ must stand if there is evidence that reasonably supports the conclusion reached.

### B.   Second Assignment of Error: Failure to Consider the findings of Plaintiff's physical therapist

Plaintiff's physical therapist, Jack Eckroad prepared a functional capacity evaluation of plaintiff.  (Tr. 627).  Eckroad opined that Plaintiff was capable of less than sedentary work and that there was "no reasonable medical certainty" that Plaintiff would ever be capable of

competitive employment. (Tr. 654). While Eckroad's opinion was included in the administrative

record, the ALJ did not address it in his opinion. Plaintiff maintains that by failing to address the

opinion, the ALJ erred and this matter should be reversed and remanded.

Under the social security regulations, an ALJ must consider all relevant evidence in the

case record. Soc. Sec. Rul. No. 06–03p, 2006 WL 2329939, at *4. In this case, the

Commissioner does not meaningfully challenge Plaintiff's assertion that the ALJ erred by failing

to consider Eckroad's opinion. Rather, the Commissioner asserts that if there was an error, that

error was harmless.

An error is harmful and remand is appropriate, when a claimant shows that she "has

been prejudiced on the merits or deprived of substantial rights because of the agency's procedural

lapses." *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983).

Here, Plaintiff fails to demonstrate that the outcome would have been different had the

ALJ considered Eckroad's evaluation report. Although Eckroad opines that Plaintiff's physical

limitations are more restrictive than those found by the ALJ, he also notes the following:

> Overall test findings, in combination with clinical observations, suggest the presence of
> sub-maximal effort on Ms. Williams' behalf. In describing sub-maximal effort, this
> evaluator is by no means implying intent. Rather, it is simply stated that Ms. Williams
> can do more physically at times than was demonstrate during this testing day. Any final
> vocational or rehabilitation decision for Ms. Williams should be made with this in mind.
>
> * * *
>
> Overall test findings, in combination with clinical observations, suggest considerable
> question be drawn as to the reliability/accuracy of Ms. Williams' subjective reports of
> pain/limitation.

(Tr. 627). These caveats significantly undermine Eckroad's opinion as to Plaintiff's limitations.

Plaintiff is unable to show any probability that, despite this inherent unreliability, the ALJ's

24

decision would have been different had Eckroad's opinion been considered. This Court is not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality." *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969). Accordingly, because Plaintiff was not prejudiced, remand is not required.

> **C.     Sentence Six Remand**

Plaintiff alternatively requests a Sentence Six remand to consider Eckroad's opinion as new and material evidence. A Sentence Six remand is not appropriate here. First, as just described, Plaintiff was not prejudiced by the ALJ's failure to consider Eckroad's opinion. Second, a Sentence 6 remand involves the consideration of new and material evidence that was not previously made part of the administrative record. 42 U.S.C. § 405(g). In this case, Eckroad's opinion was included in the record, and it was attached to the ALJ's decision. (Tr. 24).

> **VII.     CONCLUSION**

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

>     *s/Jonathan D. Greenberg*
> Jonathan D. Greenberg
> United States Magistrate Judge

Date: October 21, 2016

> **OBJECTIONS**
>
> **Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

25